**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

_____

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. Kathi Cordingley and Tracy Jones; and | ) ) ) Civil Action No. 11-cv-1087 |
| vs. | ) ) ) |
| GOOD SHEPHERD HOSPICE OF MID AMERICA, INC., and JOHN DOES 1-10, | ) **FALSE CLAIMS ACT COMPLAINT** ) **AND DEMAND FOR JURY TRIAL** ) |
| Defendants. | ) **FILED IN CAMERA AND UNDER** ) **SEAL PURSUANT TO 31 USC § 3730** |

_____

**FALSE CLAIMS ACT COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ...................................................................................................1

II. PARTIES ...........................................................................................................2

III. JURISDICTION AND VENUE ..........................................................................3

IV. BACKGROUND .................................................................................................3

    A.      Hospice Care ...........................................................................................3

    B.      The Medicare and Medicaid Programs .................................................4

    C.      The Anti-Kickback Statute ....................................................................6

    D.      The Medicare Hospice Benefit .............................................................7

           1.      Certification Requirements .........................................................8

           2.      Required Documentation ..........................................................10

           3.      The Medicare "Cap" ................................................................11

V. Relators' Allegations.........................................................................................12

    A.      Fraudulent Certification of Patient Eligibility for Enrollment in Hospice Care ....12

    B.      Fraudulent Re-Certification of Ineligible Patients Already Enrolled in Hospice Care ................................................................15

    C.      Failure to Create or Follow Mandated Plans of Care ...........................18

    D.      Other Fraudulent Billing .......................................................................19

           1.      Refusal to Return Excess Medicare Payments...........................19

           2.      Continued Billing After Payment Denied.................................19

           3.      Premature Billing .....................................................................20

    E.      Kickback Violations................................................................................20

           4.      Kickbacks to Medical Directors................................................20

           5.      Kickbacks to Nursing Homes ...................................................21

            6.      Kickbacks to "Hospice Consultants".......................................22

F.      The Impact of Good Shepherd's Fraudulent Billing.................................................23

COUNT I  FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR Fraudulent Enrollment of
        Hospice Care Patients, 31 U.S.C. § 3729 ..........................................................................24

COUNT II  FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENT
        WITHHOLDING OF EXCESS MEDICARE PAYMENTS, 31 U.S.C. § 3729..............24

COUNT III  FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR Violations of the Anti-
        Kickback Statutes, 31 U.S.C. § 3729.................................................................................24

COUNT IV  VIOLATION OF THE RETALIATION STATUTE, 31 U.S.C. § 3730(h),
        AGAINST Good Shepherd....................................................................................................25

PRAYER FOR RELIEF ...............................................................................................................25

Plaintiffs-Relators Kathi Cordingley ("Cordingley") and Tracy Jones ("Jones") (collectively, "Relators"), on behalf of the United States of America, pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), bring this action against Defendant Good Shepherd Hospice of Mid America, Inc. ("Good Shepherd" or "Defendant") and John Does 1-10, to recover penalties and damages arising from Good Shepherd's false statements and false claims in violation of the False Claims Act, 31 U.S.C. § 3729. In support thereof, Relators allege as follows:

## I.       INTRODUCTION

1.        In the course of their employment with Good Shepherd, Relators learned that Good Shepherd engaged in a fraudulent and illegal scheme to increase its Medicare and Medicaid billing for hospice patients artificially, including by (1) admitting patients who did not satisfy Medicare's eligibility criteria for hospice care[1]; (2) approving of improper re-enrollments for ineligible patients; (3) failing to follow plans of care for hospice patients as required by Medicare; (4) manipulating the Medicare cap on annual reimbursements to hospice care providers; (5) paying various forms of unlawful remuneration to increase patient enrollment in violation of the federal Anti-Kickback statute; and (6) engaging in other illegal practices designed to increase net patient revenues artificially.

2.        Defendant's rampant and continuous scheme to defraud Medicare caused false claims for reimbursement to be submitted to the United States in violation of the False Claims Act.

3.        When Cordingley complained of these fraudulent practices to her superiors at Good Shepherd, her complaints fell on deaf ears, leading to her resignation.

---

[1] Most states and the District of Columbia offer hospice benefits through Medicaid. Medicaid's criteria for hospice care mirror Medicare's.

4. When Jones expressed disapproval of Good Shepherd's fraudulent practices, the company retaliated against her by terminating her employment.

5. Relators have provided to the United States Attorney for the Western District of Missouri a disclosure of substantially all material facts underlying the allegations of the Complaint, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2).

## II.    PARTIES

6. Relator Kathi Cordingley is a citizen of the United States and a resident of the State of Kansas. Cordingley was employed as the Executive Director of Good Shepherd's Kansas City, Missouri, office from November 2010 until she resigned in April 2011. As Executive Director, Cordingley oversaw the day-to-day operations of the Kansas City office, including supervising Good Shepherd's interdisciplinary team members, nurses aides, marketing personnel, maintaining appropriate levels of pharmaceuticals, durable medical equipment, and supplies, approving billing for processing, and confirming client eligibility for hospice care. Cordingley reported to the governing board and President Jason Delester. As Executive Director, Cordingley developed direct and independent knowledge of the fraudulent scheme described herein. Cordingley is thus an original source of the facts and information set forth in this Complaint.

7. Relator Tracy Jones is a citizen of the United States and a resident of the State of Missouri. Jones was employed by Good Shepherd as a registered nurse ("RN") in its Kansas City, Missouri facility from October 2010 until she was terminated in April 2011. Jones had previously worked at Good Shepherd in 2006 for several months, initially as an on-call nurse, then as a case manager. She left Good Shepherd when she received another job offer. When Jones returned to Good Shepherd in October 2010, she worked as an admissions nurse until she was promoted to quality control and clinical supervisor. In this role, Jones developed direct and

independent knowledge of the illegal and fraudulent scheme described herein. Jones is thus an original source of the facts and information set forth in this Complaint.

8.      Defendant Good Shepherd is headquartered in the State of Oklahoma and is engaged in the business of providing hospice services to patients living at home or in long-term care facilities, assisted living facilities, and residential care facilities. Good Shepherd provides its services in Oklahoma, Texas, Kansas, and Missouri. There are nine Good Shepherd locations. The Dallas office is called "Compassionate Care." The company is owned, at least in large part, by Don Greiner, and its President is Jason DeLester.

### III.      JURISDICTION AND VENUE

9.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

10.     At all times material to this Complaint, Good Shepherd regularly conducted substantial business within the State of Missouri, maintained permanent employees and offices in Missouri, and performed, and continues to perform, significant business activities within Missouri. Good Shepherd is thus subject to personal jurisdiction in Missouri.

11.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Good Shepherd transacts business in this district.

### IV. BACKGROUND

**A.      Hospice Care**

12.     The hospice industry generates $10 - 12 billion in business annually in the United States, with most hospice care costs paid by the Medicare program.

13.     Hospice care allows a patient with a terminal illness to forgo curative treatment for the illness and instead receive palliative care to relieve pain and other uncomfortable symptoms until death.

14.     Hospice services may be provided in a patient's home, a hospital, a long term care facility or nursing home, an assisted living facility, residential care facility, or a private hospice facility. Good Shepherd's hospice services are provided either at the patient's home, assisted living facility, residential care facility, or in a long term care facility.

**B.     The Medicare and Medicaid Programs**

15.     Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. It is the nation's largest health insurance program and covers nearly 40 million people. Medicare is administered by a federal agency, namely the Centers for Medicare and Medicaid Services ("CMS").[1] Medicare pays doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *Id.*

16.     The Medicare Program includes Medicare Part A ("Hospital Insurance Program"), which provides for care in or by institutional providers, such as hospices, within specified limits. *See* 42 U.S.C. § 1395c.

17.     Medicaid was also created by Congress in 1965. *See* 42 U.S.C. §§ 1396-1396v. Medicaid is a public-assistance program that pays for medical expenses incurred by low-income patients. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. *See* 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *See* 42

---

[1] Prior to October 2001, CMS was known as The Health Care Financing Administration ("HCFA").

U.S.C. § 1396b(a)(1). The federal government then pays each state a statutorily determined

percentage of "the total amount expended . . . as medical assistance under the State plan . . . ."

*See* 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial

participation.

18.     In order to participate in the Medicare or Medicaid program, a health care

provider must enter into an agreement ("Provider Agreement") with the Secretary of HHS. 42

U.S.C. § 1395 (Medicare); 42 U.S.C. § 1396 (Medicaid). After entering into a Provider

Agreement, Medicare and Medicaid directly reimburse the provider for the reasonable cost of

services provided to covered patients.

19.     Under Medicare (and Medicaid) regulations, the term "provider" includes a

hospice that has in effect an agreement to participate in Medicare. *See* 42 C.F.R. § 400.202

(Medicare); 42 C.F.R. § 400.203 (Medicaid). A provider must comply with the requirements of

the Medicare and Medicaid programs in order to be eligible to receive payments from these

programs for hospice services.

20.     The Medicare program requires institutional health care providers, including

hospice organizations, to file a Form CMS 855A, an enrollment application in order to qualify to

receive the programs' benefits. That application requires the provider to sign a certification that

states in relevant part:

>       I agree to abide by the Medicare laws, regulations and program instructions that apply to
>       this provider. The Medicare laws, regulations, and program instructions are available
>       through the Medicare contractor. I understand that payment of a claims by Medicare is
>       conditioned upon the claim and the underlying transaction complying with such laws,
>       regulations, and program instructions (including, but not limited to, the Federal anti-
>       kickback statute and the Stark law), and on the provider's compliance with all applicable
>       conditions of participation in Medicare.

21.     Hospices are generally required to bill Medicare on a monthly basis. *See* the

Medicare Claims Processing Manual, at Chapter 11 – Processing Hospice Claims, in Section 90

– Frequency of Billing. Hospices generally file their hospice Medicare claims with their Fiscal Intermediary or Medicare Carrier pursuant to the CMS Claims Manual Form CMS 1450, also known as a Form UB-04, either in paper or electronic format. These claim forms specifically state:

> The submitter of this form understands that misrepresentation or falsification of essential information as requested by this form, may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s).

The forms also contain representations and certifications which represent that: (1) submission of the claim constitutes certification that the billing information is true, accurate and complete; and (2) the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

22. Since their enactment and implementation, the Medicare and Medicaid programs have enabled the elderly, disabled and low-income patients to obtain necessary medical services. The viability and solvency of these programs critically depend upon providers' agreements to limit their billing to services provided to individuals who are duly eligible for benefits pursuant to program rules and regulations rather than to engage in fraud and abuse.

## C. The Anti-Kickback Statute

23. Federal laws and regulations governing Medicare and Medicaid, along with similar state statutes, prohibit entities like Good Shepherd from accepting or providing kickbacks to health care providers. Specifically, the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b)(1), operates to prevent the misuse of public funds by barring Medicare and Medicaid from paying for claims that are tainted by improper solicitations, payments or other remuneration from vendors to hospital providers. The AKS provides, in relevant part, that it is illegal to "offer[] or pay[] any remuneration . . . to induce [any] person . . . to purchase, lease, order, or arrange for or

recommend . . . any good . . . for which payment may be made . . . under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

### D. The Medicare Hospice Benefit

24.　　The Medicare Hospice Benefit was passed as part of the Tax Equity and Fiscal Responsibility Act ("TEFRA") of 1982.

25.　　Under Medicare regulations, to be eligible for hospice care coverage, an individual must be eligible for Medicare Part A and the patient's physician and the hospice medical director must certify that the patient has a terminal disease and certify that the patient has a life expectancy of six months or less if the disease runs its normal course. 42 C.F.R. § 418.20.

26.　　Medicare regulations define terminally ill to mean an "individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 C.F.R. § 418.3.

27.　　An individual who meets the eligibility requirement for hospice care must file a Notice of Election ("NOE") setting forth, among other things: (1) the particular hospice that will provide care to the individual; (2) acknowledgement that the individual or individual's representative elects hospice benefits after having been given a full explanation of the nature of hospice care as opposed to curative care; (3) acknowledgement that certain Medicare services are waived by the election of hospice care. 42 C.F.R. § 418.24(b).

28.　　After the patient signs the NOE electing hospice care, the individual in charge of admissions visits the patient to determine whether he or she meets seven local coverage determinants ("LCDs") for hospice care. The LCDs form the basis on which patients are admitted to hospice care and determine whether the hospice gets paid for its services.

29.     Medicare regulations require that a hospice designate an Interdisciplinary Group or groups comprised of hospice employees that includes at least the following : (1) a doctor of medicine or osteopathy; (2) a registered nurse; (3) a social worker; and (4) a pastoral or other counselor. 42 C.F.R. § 418.68(a).

30.     The Interdisciplinary Group is responsible for participation in the establishment of the plan of care, provision or supervision of hospice care and services, periodic review and updating of the plan of care for each individual receiving hospice care, and establishment of policies governing the day-to-day provision of hospice care and services. 42 C.F.R. § 418.68(b).

31.     When a beneficiary elects hospice care, the hospice is paid a predetermined fee for each day the patient receives care -- or *per diem* rate -- regardless of the amount of care the hospice provides. Medicare's payment of the *per diem* rate is intended to cover costs that the hospice incurs in furnishing the services enumerated in the patient's plan of care.

### 1.     Certification Requirements

32.     Hospice care must be approved at the beginning of a benefit period. The initial benefit period covers 90 days. At the end of that period, care recipients can be recertified for one subsequent 90-day period. At the end of the second 90-day period, recipients can only be recertified for 60-day benefit periods. 42 U.S.C. § 1395d(a)(4).

33.     At the beginning of the initial 90-day benefit period, the individual's attending physician and the medical director or physician member of the Interdisciplinary Group of the hospice program providing or arranging for the care must each provide a written certification that the patient is terminally ill.

34.     In reaching a decision to certify that the patient is terminally ill, the hospice medical director or physician member of the Interdisciplinary Group must consider the diagnosis

Case 4:11-cv-01087-GAF   Document 1   Filed 10/25/11   Page 11 of 30

of the terminal condition of the patient, other health conditions, and all current clinically relevant information supporting the patient's diagnoses. 42 C.F.R. § 418.22(b).

35. The hospice may admit a patient "only on the recommendation of the medical director in consultation with, or with input from, the patient's attending physician (if any)." 42 C.F.R. § 418.25.

36. Following the initial election of hospice care, the admissions nurse must perform as assessment of the patient, assist in the creation of a plan of care, and document why the patient is qualified for care. In order for the patient to be admitted formally, the physician and medical director must issue a signed order within five days of the preparation of the nurse's assessment. 42 C.R.F. § 418.54(b).

37. After the initial certification, a doctor must re-certify that a patient is terminally ill and recertify at the beginning a second 90-day period and every 60 days thereafter. 42 U.S.C. § 1395f(a)(7). In other words, a hospice must not only certify a patient's initial eligibility for hospice care, it also must certify the patient's continued eligibility for hospice care on a regular basis.

38. While a beneficiary may potentially be eligible for an unlimited number of benefit periods, a physician must properly and conscientiously re-certify the six-month prognosis using clinical data at the beginning of each period for a beneficiary to continue to receive hospice care. *See generally* 42 C.F.R. § 418.22.

39. The re-certification of a patient should be based on a hospice physician's clinical judgment of the patient's prognosis. The continued existence of the terminal illness that initially made the patient eligible for hospice care, in the absence of other current clinical information concerning prognosis, is insufficient to warrant re-certification for hospice care. 42 C.F.R. § 418.22.

40.     As of January 1, 2011, Medicare requires that patients receiving hospice care must be seen by a doctor or a hospice-employed nurse practitioner, face-to-face at each recertification period prior to being recertified.  42 C.F.R. § 418.22(a)(4).

### 2.     Required Documentation

41.     Medicare regulations require that a hospice maintain a clinical record for each patient. 42 C.F.R. § 418.74.

42.     Written certifications must be included in the admitted patient's medical records. *See id.* at § 418.22(d)(2). Although there are some exceptions to this rule, a hospice provider must obtain a written certification of eligibility before it submits a claim for payment under Medicare. 42 C.F.R. § 418.22(a)(3).

43.     A patient's clinical record must be sufficient to support hospice care claims in that it must contain documentation to support the patient's prognosis at the time of each re-certification that the patient has a terminal disease and has 6 months or less to live if the disease runs its normal course. Each patient's clinical record must contain: (1) the initial and subsequent assessments; (2) the plan of care; (3) identification data; (4) consent and authorization and election forms; (5) pertinent medical history; and (6) complete documentation of all services and events (including evaluations, treatments, progress notes, etc.). 42 C.F.R. § 418.104(a).

44.     Plans of care must be developed by the attending physician, the medical director or physician designee, and the Interdisciplinary Group prior to the initiation of care. The plans themselves must include, among other components, an assessment of the patient's needs, identification of services, and a detailed statement of the scope and frequency of needed services. 42 C.F.R. § 418.56.

45.     Under the Medicare program, the accurate and truthful certification and re-certification by a physician of a beneficiary's eligibility for hospice care at the beginning of each

benefit period is material to entitlement and payment of hospice care by Medicare. 42 U.S.C § 1395f(a)(7).

### 3. The Medicare "Cap"

46.     The Medicare program imposes a yearly aggregate payment limit on hospice providers that equals the number of beneficiaries enrolled in the hospice program each fiscal year, multiplied by an amount that changes each year based on inflation. The method of calculation is set forth in 42 U.S.C. § 1395f(i)(2)(a), (C). This limit is sometimes known as the "cap." For 2011, the individual cap is $23, 874.98.

47.     The cap is intended to incentivize hospices to keep their lengths of stay within the suggested six month period of terminal illness.

48.     There is an individual cap amount used for each hospice patient enrolled during the hospice cap year period. If the hospice enrolls patients with short lengths of stay, then the cap amounts for the recipients are not exhausted, and this allows the hospice to bill more days for another patient who may survive longer and whose services require reimbursements that exceed the individual cap amount.

49.     Hospices' per diem rates vary depending on the patient's condition and the level of care required. For example, if a patient is in crisis when he or she begins to receive hospice care, the rate will be higher than for most others because the hospice will provide services such as "continuous care." For 2011, the rates are as follows: Routine Home Care -  $ 146.63; Continuous Home Care - $ 855.79; Inpatient Respite Care - $ 151.67; and General Inpatient Care - $ 652.27.

## V. RELATORS' ALLEGATIONS

### A.    Fraudulent Certification of Patient Eligibility for Enrollment in Hospice Care

50.    Good Shepherd engaged in a pattern and practice of fraudulently certifying patients for enrollment in their hospice care programs. According to the Relators, many of Good Shepherd's patients do not meet the criteria for admission and should not be certified to receive hospice care prior to enrollment.

51.    To facilitate its fraud, Good Shepherd not only encourages employees to falsify and omit documentation intentionally from patient files, it also fails to provide its employees with standard education on who is and who is not eligible for hospice benefits. Further, Good Shepherd has no compliance program to ensure that Medicare's requirements are met. In addition, Good Shepherd routinely hires nurses who lack hospice experience. This practice not only lowers costs due to the nurses' lower wages, it also increases the likelihood that patients will be approved improperly for hospice benefits.

52.    When Cordingley began her position as the Executive Director in November 2010, she reviewed 79 active files. To her astonishment, Cordingley found that as many as 30 of those patients had been ineligible for hospice care ***when accepted*** because their files lacked sufficient medical documentation to show they were eligible for hospice care. Cordingley immediately discharged almost all of the 30 patients. Many of the discharged patients' charts contained incomplete records and no plans of care. Additionally, while the records did contain doctor's certifications of eligibility, the records failed to satisfy other criteria necessary to establish patient eligibility for hospice care. For example, some charts were missing copies of CT scans, MRIs, lab results, medical histories, records of physical exams, clinical representations of the patient's terminal diagnosis and/or condition, physician progress notes, and prescription orders -- all documentation of a patient's diagnosis that is required by regulation to be kept in the

patient's chart. In addition, some nurses dispensed medications even though there were no physician's orders for prescriptions in the patients' charts.

53.     During the second month of her employment, Cordingley disqualified twelve patients. Among them was a dementia patient who, notwithstanding Medicare's eligibility requirement that a dementia patient must be unable to communicate with more than six words, was able to speak fluent Spanish. Cordingley also discovered that there were patients with Alzheimer's Disease residing in assisted living facilities who were improperly receiving hospice care because they could walk and engage in conversation with others without assistance.

54.     Jones alleges Good Shepherd improperly enrolled patients who it subjected to a "30-day observation" period the company instituted to enable it to enroll patients who had already been found to be ineligible. No such 30-day observation period is permitted by Medicare's hospice regulations.

55.     According to Jones, after Cordingley's departure, Angel Yanez, the interim Executive Director, who also held the position of Regional Clinical Nurse Consultant for Good Shepherd hospices, ordered Jones to bring a number of patients on for such an observation period even after Jones had determined they were not eligible for hospice care. Jones recalled that ineligible patients were enrolled at Good Shepherd in this manner even when she worked at the company in 2006.

56.     According to Jones, before she was terminated in April 2011, a nurse named Kendra Smith determined an Alzheimer's patient, Patient X, should not be accepted for hospice care because he lived in an independent living facility and was able to walk and engage in conversation with others unassisted. Jones agreed with Smith's assessment that any patient housed in an independent living facility should not be admitted to hospice unless he or she is unable to function. Yanez told the nurses, however, that one of the hospice's Medical Directors,

Dr. Kurth, had advised that Patient X had less than six months to live and had qualified him for hospice care on that basis. As a result, Yanez instructed the nurses to enroll the patient for a 30-day observation period. Smith advised Yanez that she did not want to sign off on the admission, but Yanez strongly pressured her to do so. Jones later reviewed Patient X's admission ticket and noticed that a significant amount of information was absent from it. Jones then told Yanez: "I would never have admitted this guy; he is not appropriate; he does not meet criteria."

57.     Jones was adamant about not admitting Patient X, but Yanez insisted it was appropriate to do so. After Smith refused to admit the patient, Yanez asked Jones to complete Smith's initial assessment. Jones refused, telling Yanez that what she was asking was illegal. Jones documented what she saw with the patient and told Yanez she wanted to discharge the patient because he was not appropriate. Yanez responded that, if Jones believed patients were "not appropriate," she should contact her (Yanez), and she would tell Jones why they were appropriate. In addition to Yanez, Bonnie Crilly, the Patient Care Manager, and Sally Alberg, the marketer, pressured Tracy to admit Patient X.

58.     After the incident, Yanez sent Patient X's paperwork to one of the doctors, Dr. Kurth, who refused to sign it because it lacked sufficient documentation. As a result, Yanez asked Jones to write an addendum, something Jones had never been asked to do before. Yanez told Jones what to write, but Jones also documented that the patient was "walking, talking, up and about, and listening to the radio."

59.     Jones believes this incident led to her termination.

60.     Jones alleges another patient was admitted in 2010 and kept on hospice illegally because the patient was the only hospice patient at Carmel Hills Nursing Home. Jones stated Good Shepherd kept recertifying the patient to enable it to continue marketing to the nursing home. According to Cordingley, "If you don't have any patients in a nursing home, then you

don't have the opportunity to grow that business in that nursing home. They would keep patients on because it was their foot in the door."

**B.      Fraudulent Re-Certification of Ineligible Patients Already Enrolled in Hospice Care**

61.      Relators also discovered that patients who had been improperly admitted to hospice care were routinely being improperly recertified without meeting eligibility requirements.

62.      The Relators possess redacted patient records showing that numerous patients received hospice care for much longer than six months, with some receiving care for as long as three years, and others still alive and receiving care presently.

63.      For example, Patient 731573 was admitted on December 19, 2008 and recertified almost 20 times with a diagnosis of "failure to thrive." "Failure to thrive" generally refers to a patient's having given up the will to live and means a patient has refused to eat, drink, and perform other basic tasks necessary to stay alive. This condition does not establish hospice eligibility for someone who has survived in a hospice setting for three years.

64.      Patient 731443 was admitted on June 20, 2008 for cerebrovascular disease and stroke and recertified a minimum of 14 times, with additional recertifications projected as of October 14, 2010.

65.      Another patient, Patient 731837, had been diagnosed with Stage 4 ovarian cancer but was still living, and receiving hospice care, three years after the diagnosis. According to Jones, Patient 731837 was often out shopping went Jones went for regularly scheduled visits.

66.      Patients 731443 and 731837 were still receiving hospice care as late as February 2011. Good Shepherd has billed Medicare for the entire period during which these patients have received hospice care, even though the patients fail to meet the recertification requirements.

67. Other records show as many as twenty-four improper recertifications. For example, Patient 731538 was admitted on November 14, 2008 and, according to information from October 2010, was scheduled for recertification on November 4, 2010. Patient 731538, a patient with uncomplicated senile dementia, was recertified at least 27 times.

68. Similarly, Patient 730822 was admitted on October 9, 2006, and, as of October 2010, was scheduled to be recertified on November 17, 2010.

69. Patient 731069, a coronary heart disease patient, was recertified at least 24 times.

70. Patient 730822, an ALS patient, was recertified at least 27 times.

71. Patient 731976, a pancreatic cancer patient, was recertified 20 times.

72. According to Cordingley, the doctors who repeatedly certified that patients would expire within six months were "absolutely" lying "over and over and over again."

73. As a result of the new face-to-face requirement implemented in 2011, the number of patients receiving hospice care from all seven of the Good Shepherd locations decreased dramatically because the reviewing doctors and nurse practitioners determined the patients were ineligible for hospice care after the face-to-face meetings. In response, Good Shepherd stepped up its efforts to keep enrollments high.

74. For example, on February 8, 2011, Cordingley participated in a special, urgent conference call to address the new regulations. The call included President DeLester and the Executive Directors of all of the hospices that fell under his direction. DeLester told the Executive Directors that they needed "to stop the bleeding." At about the same time, "no longer eligible" was removed as an option on a drop-down menu for documenting discharges.

75. During the February 8 conference call, DeLester also instructed the participants that they could no longer discharge ineligible patients via email because the emails were "discoverable."

76.     Debbie Wells, the Regional Nurse Consultant, also participated in the February 8, 2011 call. The Relators both described Wells as DeLester's "right-hand man." During the call, Wells instructed the Executive Directors that "everyone who comes onto hospice as 'terminal' will always be 'terminal.' They were admitted as 'terminal' and they will always be 'terminal,' so just get that through your heads." Cordingley explained that Wells's comments meant that, if a patient was brought on as terminal but continued to live, that patient would still be recertified as "terminal" so that Good Shepherd could keep them on. There would be no need for recertifications if the patients were truly terminal. Immediately after the call, Kim Sipes, Executive Director of Compassionate Hands Hospice in Dallas, called Cordingley and asked incredulously: "[c]an you believe what Debbie Wells said?!"

77.     Jones is in possession of the records she was required to have with her in case she was ever needed to perform an on-call (or after business hours) visit to a patient. Good Shepherd did not ask her to return them upon her termination. In one record, Jones noted that the doctor "refused to sign-off on face-to-face." In another, she noted the patient "didn't meet criteria but kept on anyway. Been on for 2 yrs, 4 mos & 9 days."

78.     Another example of Good Shepherd's unlawful re-certification practices involved Patient Y, who was under hospice care beyond her third benefit period [when she suffered a stroke]. Patient Y required a two to three week hospital stay to be treated for the stroke, after which the hospice planned to readmit her. However, the hospice improperly revoked the patient's admission to the hospice program to avoid covering the patient's hospital bill. To be readmitted to hospice care, Patient Y was required to have a face-to-face meeting with a doctor due to the January 2011 change in recertification requirements. In actuality, the patient was actively dying, and the face-to-face meeting did not occur before her death.

79. The patient was readmitted, however, with no indication that she was actively dying. Because the patient died a few days after readmission without a face-to-face meeting ever having been done, Yanez had one of the nurses change the admission documents to make it look like the patient had been actively dying at the time of admission, apparently as a result of the mistaken belief that Medicare will waive the face-to-face meeting requirement when a patient is actively dying.

80. Just prior to Jones's termination, she tried to locate Patient Y's admissions paperwork but was unable to do so. Jones later learned that Yanez had instructed one of Jones's colleagues to hide the paperwork because no face-to-face meeting had occurred.

### C. Failure to Create or Follow Mandated Plans of Care

81. Cordingley and Jones both state that Good Shepherd almost never followed plans of care for patients. Moreover, any plans of care that were even created by Good Shepherd were often incomplete.

82. Patients' clinical files, which were intended to include plans of care, were often incomplete in other ways as well, and they were often completed retroactively, when they were completed at all. For example, medication lists are a part of plans of care. Medication updates often were not listed at all, and doctors' orders for medication were missing. Nurses would fill out medication lists retroactively.

83. Good Shepherd's nurses were often not trained by the hospice on how to create them. However, many doctors regularly signed off on plans of care that failed to include adequate documentation regardless. According to Jones, in some instances, the plans of care that were created were not signed by the medical director, and the medical director would often not attend team meetings at which the plans of care were developed, as required

84.     Patients who were admitted as early as 2007 and were still in hospice care at Good Shepherd when Relators were there sometimes had plans of care and accompanying charts that had not even been updated to include such critical items as prescription orders. According to Jones, these incomplete files were moved to remote locations to avoid scrutiny by state auditors. Jones states: "[n]urses would go back to the nursing home, get the physicians' order sheets, and try to [retroactively] update their orders that had been gone for years."

85.     The fraudulent recertifications enabled Good Shepherd to circumvent the hospice cap by increasing the number of patients who could be included in the calculation.

### D.     Other Fraudulent Billing

#### 1.     Refusal to Return Excess Medicare Payments

86.     Cordingley asserts Good Shepherd and President DeLester refuse to return excess payments to Medicare, recalling that, when she discharged patients who received care beyond their eligibility periods, Good Shepherd never paid Medicare back. She believes Medicare was unaware this was occurring because the records provided to it reflected that the patient was a live discharge. In fact, during the special conference call in February, Cordingley pointed out that excess payments would have to be returned. DeLester said he would not do that.

#### 2.     Continued Billing After Payment Denied

87.     According to Cordingley, Good Shepherd engaged in an additional improper billing practice where it continued to bill for patients after Medicare declined to pay for their care. One example involves a patient, Patient 731655, who was admitted on March 27, 2009 for dementia. During Cordingley's tenure, Medicare requested an Additional Documentation Review ("ADR") of Patient 731655's paperwork for a particular month. The necessary paperwork was sent to Medicare, and Medicare denied payment for Patient 731655's care for that month. According to both Relators, however, Good Shepherd was still billing for Patient

731655 when they left because Medicare's denial only applied to that particular month. The fact that Medicare denied the patient one month should have been a big red flag that it was improper to continue bill for this patient. Nevertheless, Good Shepherd continued to bill in the hope that Medicare would not notice its earlier denial.

88. Patient 731655 was not the only patient who Good Shepherd continued to bill for after an ADR. Patient X was also kept on after such a request. According to the Relators, Good Shepherd falsified documentation by changing the diagnoses to be able to keep billing for patients like Patient 731655 and Patient X.

### 3. Premature Billing

89. Cordingley also described improper billing for patients prior to their admission to the hospice. The Executive Director of Good Shepherd's Grove, Oklahoma nursing hospice told Cordingley about how patients would routinely sign an NOE on a Friday while a nurse would not do the actual admission until Monday. The hospice would start billing for services on Friday. Cordingley advised the Executive Director that a hospice cannot properly bill for a patient until the patient is actually admitted by the nurse. The Director and Jason DeLester objected to Cordingley's identification of this improper practice, causing her to drop the issue.

### E. Kickback Violations

90. Good Shepherd also engaged in several fraudulent kickback schemes calculated to maximize enrollment of patients and, as a result, the amount of government reimbursement for their hospice care. Had the government known that patients enrolled with Good Shepherd as the result of an illegal kickback scheme, the government would not have provided reimbursement for the care of these patients.

### 4. Kickbacks to Medical Directors

91.      According to the Relators, Good Shepherd employs four to five Medical Directors whose continued employment is conditioned upon their ability to bring in referrals. According to Cordingley, "Medical Directors work about two hours a month, sit in on a team meeting, and get paid about $3,000 per month."

92.      Cordingley relates that she "had to terminate one of the Medical Directors, Dr. Christopher Trimble, who wound up resigning, but it was my job to go to talk to him because the President [DeLester] said that Dr. Trimble was not bringing in enough referrals."

93.      Dr. Trimble was paid $2,800 per month. According to Cordingley, "Jason [DeLester], the President of the company told me to go and talk to Dr. Trimble and point out that he was making $2,800 per month and not bringing in any referrals. He (Dr. Trimble) resigned two months later." Cordingley explains that "Jason DeLester threatened -- wanted me to threaten Dr. Trimble that if he did not bring in any referrals that he would be fired." She also states: "I told Dr. Trimble that Jason told me that if you (Dr. Trimble) do not bring in referrals that we are probably going to look at replacing you." According to Cordingley, this was "absolutely" a quid pro quo.

94.      Jones ran into Dr. Trimble after he left Good Shepherd and asked him why he left. Dr. Trimble replied that he had no choice because Good Shepherd wanted more referrals but he did not enough faith in the quality of Good Shepherd's care to warrant them. Dr. Trimble told Jones he was unwilling to make the referrals even though he knew he was going to be terminated.

95.      Cordingley said Medical Directors had to bring in at least one patient per month for their efforts to be considered acceptable to Good Shepherd.

**5.      Kickbacks to Nursing Homes**

96.     Cordingley relates that Good Shepherd provided illegal kickbacks to nursing homes by encouraging hospice nurses to perform the work of an extra nursing home employee when they provide services to hospice patients in the nursing homes. Indeed, nursing homes frequently request that the hospice employee perform additional responsibilities outside of caring for their assigned patient. Cordingley explains that hospices will offer inducements to nursing homes such as: "[i]f you give me five patients, I'll put a nurse's aide in your building all day long." In other instances, Good Shepherd would provide inducements to the hospital, such as 24-hour continuous care, for the first three days.

97.     According to Cordingley, before her employment with the company, Good Shepherd had also provided goods to nursing homes at below-market value in exchange for referrals.

98.     Another example of Good Shepherd's provision of illegal remuneration to nursing homes to retain their business involved payments for nursing home care. Hospices are required to pay nursing homes for services and bill Medicare for room and board. Those services may only be paid at the Medicare rate -- not more -- and may be paid only if the hospice already has received a payment from Medicare. Nevertheless, Cordingley observed that Good Shepherd paid nursing homes for room and board even when it did not receive a payment from Medicare due to incomplete paperwork. Good Shepherd engaged in this practice over Cordingley's objection.

99.     Good Shepherd gave perks to nursing homes in an attempt to become a preferred hospice care provider. For example, it frequently provided nursing home staffs with free lunches and gift baskets. In some instances, they provided expensive Broda chairs to nursing homes.

### 6.     Kickbacks to "Hospice Consultants"

100.     Jones alleges that marketers, referred to by Good Shepherd as "Hospice Consultants," received bonuses for admissions and were fired if they did not meet their quota of

five patients per month. According to Jones, Good Shepherd "did a lot of things with their own money to entice the nursing home and doctors. Kathy A., one of the marketers, would make up some really nice gift baskets."

101.    Hospice Consultants are required to be salaried employees and were ostensibly paid to educate the local community about hospice services., Nevertheless, Cordingley learned that Good Shepherd paid Hospice Consultants per-patient bonuses, including bonuses for admitting ineligible patients.

### F.    The Impact of Good Shepherd's Fraudulent Billing

102.    Based upon her review of records and discharge of more than a third of the fraudulently admitted patients, Cordingley prepared an estimate of the financial impact of the fraud in Good Shepherd's Kansas City facility on the Medicare program.

103.    Specifically, Cordingley estimates that 40 patients were ineligible for hospice care in December 2010. Good Shepherd charged $130 per day for each patient, for a total of $5,200 for ineligible patients per day, or $156,000 per month, yielding $1,872,000 per year. With seven facilities, Good Shepherd's total fraud could cost Medicare about $13,104,000 per year. Based in part on the February 2011 company-wide conference call, both Relators believe the fraud was occurring at all of Good Shepherd's facilities. Indeed, Cordingley states that she knows for a fact that the practices she witnessed were happening at other Good Shepherd locations through meetings held at the corporate office with all of the other Good Shepherd administrators, through emails with other Good Shepherd hospice administrators throughout, and phone calls with other Good Shepherd hospice administrators.

**COUNT I**

**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENT ENROLLMENT OF HOSPICE CARE PATIENTS, 31 U.S.C. § 3729**

104.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

105.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

**COUNT II**

**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENT WITHHOLDING OF EXCESS MEDICARE PAYMENTS, 31 U.S.C. § 3729**

106.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

107.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1).

**COUNT III**

**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR VIOLATIONS OF THE ANTI-KICKBACK STATUTES, 31 U.S.C. § 3729**

108.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

109.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2).

# COUNT IV

## VIOLATION OF THE RETALIATION STATUTE, 31 U.S.C. § 3730(H), AGAINST GOOD SHEPHERD

110.     Relator Jones re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

111.     Good Shepherd retaliated against Relator Jones by terminating her because she would not create fraudulent documents stating that ineligible patients were eligible for hospice services. This discharge was in violation of 31 U.S.C. § 3730(h).

112.     As a direct and proximate result of this unlawful and discriminatory discharge, Relator Jones has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with his efforts to obtain alternative employment, in an amount to be proven at trial.


## PRAYER FOR RELIEF

**WHEREFORE**, Relators request that judgment be entered against Defendant, ordering that:

A.     Defendant ceases and desists from violating the False Claims Act, 31 U.S.C. §§ 3729-33, as amended;

B.     Defendant pays not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461; Public Law 104-410), plus three times the amount of damages the United States has sustained because of Defendant's actions;

C.     Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

Case 4:11-cv-01087-GAF   Document 1   Filed 10/25/11   Page 28 of 30

D.    Relator be awarded all costs of this action, including attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d); and

E.    The United States and Relators be awarded such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: October 25, 2011

Respectfully submitted,

**BARTIMUS FRICKLETON ROBERTSON & GORNY, P.C.**

By:  /s/ Anthony L. DeWitt
Anthony DeWitt
Jefferson City Office
715 Swifts Highway
Jefferson City, MO 65109
Tel: (573) 659-4454
Fax: (573) 659-4460

*Local Counsel for Plaintiffs-Relators Kathi Cordingley and Tracy Jones*

Kirk E. Chapman
Ross B. Brooks
Leigh Smith
**MILBERG LLP**
One Pennsylvania Plaza
New York, New York 10119-0165
Tel:  212.594.5300
Fax:  212.868.1229

*Lead Counsel for Plaintiffs-Relators Kathi Cordingley and Tracy Jones*

George Pressly, Esq.
Konstantine Kyros, Esq.
**KYROS & PRESSLY LLP**
60 State Street, Suite 700
Boston, Massachusetts  02109
Tel:  603.320.7030

*Co-Counsel for Plaintiffs-Relators Kathi Cordingley and Tracy Jones*